GULOTTA, Judge.
The sole and only heir, Mrs. Anne True Meyer, daughter of the decedent, appeals from the dismissal of her opposition to the first, second, third and final accounts of the testamentary executor, Dr. Wallace Rubin.
While claiming evidentiary errors by the trial judge,[1] the primary thrust of the opponent’s opposition is to the executor’s payment to himself and the succession’s attorney salary and fees totaling $131,964.77. In addition, Mrs. Meyer seeks reimbursement to the estate of statutory penalties at the rate of 20% per annum of the amount illegally withdrawn from the succession. See LSA-C.C.P. Art. 3222.
Cedric Jack True died in the city of New Orleans on July 27, 1972. He was survived by one major daughter, Anne True Meyer, and a widow by a second marriage, Juana True. At the time of death, decedent was a 100% shareholder of Aztec Corporation, a land and real estate development company. The corporate assets constituted in excess of 80% of the $1,629,409.55 succession assets.[2] These assets consisted of separate funds of the decedent and property in community with his surviving spouse. Dece *303 dent’s last will directed that 20% of his separate estate be held in trust for the surviving spouse and the “remaining fractional share” of all property in his estate be held in trust for the benefit of his daughter Anne. The Hibernia National Bank in New Orleans was named trustee, Dr. Wallace Rubin executor, and Louis A. DiRosa attorney for the executor. The will further stated:
“I direct that the trustee upon my death liquidate the Aztec Corporation.”
At the time of death, the corporation owned rental property and was constructing a shopping center. After assuming responsibility as executor of the succession, Dr. Rubin conducted the affairs of the corporation and exercised the responsibility for collecting rent, finishing the construction of corporate property, and paying corporate business obligations. Despite the recitation in the will that the trustee liquidate the corporation upon death of decedent, it was not liquidated until March, 1977.
The complaint against the executor and the attorney for the succession is that by permitting the corporation to remain unliq-uidated for approximately five years subsequent to the death of the decedent (contrary to the dictates of the will) they received unnecessary salary and fees for services rendered to the unliquidated corporation.
The opponent-heir contends that the executor violated his fiduciary responsibility to the succession in appointing himself president of Aztec Corporation without prior court approval and receiving $107,600.00 from the corporation in salary for the same services required of him as executor and for which he received an additional $45-50,-000.00 executor’s fee. The opponent seeks reimbursement of the salary paid and claims further that, because of negligence and mismanagement of the succession, the executor overpaid the federal estate tax to the extent of $80,000.00. She also contends the executor benefitted financially in his personal dealings with a bank where he purchased succession certificates of deposit over which he had sole control. Finally, she complains that $20,100.00 was paid to the succession’s attorney, without court approval, in addition to his fee as attorney for the succession.
Dr. Rubin, in answer to the appeal, claims $100,000.00 in damages for “personal anguish” and injury to his reputation and honesty caused by the appeal.
Finding no merit to these contentions, we affirm.
The trial judge in well-considered and well-articulated reasons for dismissing the opposition, stated in pertinent part:
“The remaining opposition items are those headed “F” and “K”. Item “F” having reference to the payment of $107,-600.00 as salary paid by the corporation which was wholly owned by the Succession, the salary having been paid to the same individual who was the Executor of the estate. Item “K” refers to the sum of $20,100.00 paid to the corporation’s attorney who was the same attorney who represented the Executor.
The sole question for determination in respect to items “F” and “K” is whether or not Dr. Rubin was legally entitled to be paid a fee as Executor of the estate and another fee for acting as President of the corporation, the stock of which was wholly owned by the succession. The Court has examined the authorities referred to by both parties to this litigation, but does not find that the facts in the cited cases are analogous to the facts in this case. Hence, the matter may well be res nova.
The decedent, prior to his death owned the stock of a corporation which was operating and its principal asset was real estate forming a large shopping area. Whether there were problems in connection with the operation and management of the property of the corporation, at the time the decedent made his will, is unknown to the Court, no evidence of that fact having been introduced into evidence. However, in the testator’s will he specifically directed that upon his death the ‘Trustee’ liquidate the corporation. Since the Trustee must have been ac- *304 quáinted with the provisions of the will and took no steps to ask that the provision of the will be carried out; and since neither the other legatee nor opponent herein (the sole heir at law) took any steps to have the corporate stock of the corporation turned over to the Trustee, it must be presumed that all were in agreement that there were reasons why the corporation should not be liquidated at that time. The record shows that it was on the advice of the auditors that the executor did not dispose of the corporate stock, but he actively operated the corporation until it was disposed of.
At this point it must be noted that had the executor turned the stock of the corporation over to the Trustee, as soon as possible, after he became executor, he would nevertheless been entitled to the same amount of an executor’s fee as was paid to him after servicing as executor for some six or more years.
As previously set forth, neither the legatees nor the sole heir of the decedent, who was for some time an officer of the corporation, voiced any objection to the Executor becoming the President of and managing the corporation’s operations. On the contrary, the opponent herein was employed by the corporation and drew a salary along with the Executor, who served as President of the corporation. The evidence also indicates that the opponent was in attendance at many, if not all, of the corporate meetings and had full knowledge of the fact that the Executor was drawing a salary as President of the corporation.

As also previously stated herein, the record shows that the opponent attended many, if not all, of the corporate meetings. Not only did the opponent attend, but her husband, a highly respected member of the bar, also attended one or more meetings. The record would further indicate that Mr. Meyer was well acquainted with most of the problems of the corporation and the status of the projects undertaken by the corporation, which, at one stage, apparently required financing which Mr. Meyer attempted to secure for the corporation. Yet, at no time was it ever suggested that the Executor was not acting properly in drawing a salary (along with Mrs. Meyer) in the operation of the corporation.
The Court is of the opinion that in the absence of specific statute or code Article prohibiting an Executor from acting as President of a corporation in which the succession is part or full owner of the corporate stock, the Court must hold that the position of the opponent is not well taken.”
The record amply supports the conclusions reached by the trial judge.
Anne True Meyer testified that as vice president of the corporation prior to her father’s death she had the responsibility of collecting rent, doing bookkeeping and signing checks. She stated that she had received $1,000.00 per month in salary subsequent to the death of her father in 1972 until the corporation was liquidated in 1977. Despite her claim that she was unaware until May 31, 1975 that Dr. Rubin was receiving a salary from the corporation, she acknowledged that she had attended meetings annually with her husband Donald Meyer, Dr. Rubin, John McGrath (the accountant with A.A. Harmon & Company, the accounting firm handling the corporation), the decedent’s surviving spouse, and the attorneys representing succession interests. She acknowledged also that she had been furnished corporate balance sheets and had made no objection to Rubin’s salary, or the executory and attorney’s fees until 1975.
Although Mrs. Meyer testified she was not aware that office rent was being paid to the succession attorney and that secretarial services were being charged to Aztec, she further stated she had access to the corporate books prior to her father’s death and for a very short time subsequent to his death and admitted she had made no request to see the corporate check books. Her explanation was that she was not allowed in the office.
*305 Donald Meyer, Anne’s attorney-husband until 1976, testified he had accompanied his wife to the succession and corporate meetings attended by the executor, the respective parties in interest and their attorneys. Although not representing his wife in the succession, he was of the opinion that the inventory expenses were unnecessary but he acquiesced because the estate was being handled by the succession attorneys and Dr.Rubin. He acknowledged that he had made no objection to the premature payment of the executor and attorney’s fees and at these meetings had agreed to assist in obtaining financing for the corporation because of a limited cash flow problem. It was his understanding that the explanation given by the accountants for the corporation was that liquidation of the corporation shortly after the death of the decedent might accelerate payment of the federal estate tax and thereby not allow the succession to pay the tax in installments.
Dr. Wallace Rubin, the executor, testified that he had attended several meetings with the heirs and the respective attorneys, as well as the corporation accountant. At these meetings the agenda was handled by the accountant, and a year-end financial report was furnished to all persons present. He stated that he received from the corporation $20,000.00 per year for his services as president.
According to Dr. Rubin, the construction superintendent of Aztec left the corporation after Cedric True died. There existed serious problems regarding completion of construction of corporate property that had commenced prior to True’s death. Rubin stated that he was concerned with early completion of these projects to satisfy shopping center tenants. Repair problems to the property and collection of rent occupied a great deal of his time, according to his testimony. Although he initially intended to liquidate the corporation in 1973, it became evident from the advice of the corporation accountants that the early liquidation would result in tax disadvantages. At the meetings with all parties in interest, profit and loss statements, work sheets, and projections were furnished.
Rubin testified further that no complaints were made about him or his salary as president until August, 1975, and no complaints were made to him about the executor or attorney’s fees or the inventory. He denied ever refusing to accept the services of Anne Meyer, and stated that in addition to the $1,000.00 per month paid her from the corporation, she received a $114,-000.00 advance on her inheritance. Finally, Dr. Rubin testified that no one offered assistance to him in carrying out the day-today operations of the corporation and that his earning capacity as a physician was reduced because of the time devoted to the corporation.
Joseph L. Barbe, an associate with A. A. Harmon & Company, testified that his accounting firm had handled the corporations business before and after True’s death. It was upon Harmon’s advice that the corporation was not liquidated because of fear of acceleration of the federal tax liability. The accounting firm was concerned with the cash-flow shortage and the drain on the corporation. This witness acknowledged, however, that a refund of $60,-000.00 was being sought by the succession from the Internal Revenue Service because of an estate tax overpayment. Apparently this had occurred because the inventory value of the corporate assets exceeded subsequent sale prices received.
Barbe’s testimony was disputed by Curt D. Steiner, a certified public accountant who made a financial analysis of the corporate structure subsequent to True’s death. This witness testified on behalf of the opponent. According to Steiner, had the corporation been liquidated earlier in accordance with the requirements of the will it would have saved approximately $28,000.00 in Louisiana income tax. According to this expert, the earlier liquidation would not have necessarily required immediate payment of the state tax and would not have prevented the succession from paying the tax in installments. Because of over-valuation of the corporate stock and assets, an overpayment was made in federal estate *306 tax. Steiner recognized, however, that one of the reasons the liquidation had been delayed was to allow for negotiations of beneficial financial arrangements concerning mortgages and other matters. It was his impression that all parties were present at a meeting in February, 1973 when they concluded that the liquidation of the corporation would not be to the best interests of the succession or the corporation.
Norman P. Landry, a business acquaintance of the decedent and employee of R. M. Walmsley, decedent’s partner in the construction and management of the shopping center, stated that Dr. Rubin had handled the affairs of the corporation on an almost daily basis. According to this witness, corporate buildings were completed and defects in construction were rectified through Rubin’s efforts. Landry added that discussions were had with Rubin on renovations and air conditioning, plumbing, electrical and leasing problems.
Finally, Russell J. Schonekas, attorney for Juana True Coughran, the surviving spouse, stated that he had attended annual meetings of the corporation until it was liquidated. On at least three or four occasions, he had attended with Anne and Donald Meyer who were furnished financial information. The May 31,1973 balance sheet, according to Schonekas, showed that both Rubin and Anne Meyer were receiving salaries from the corporation. He learned shortly after commencing his representation of the surviving spouse that Rubin was receiving corporation pay, and his client was aware of this also. According to Schonekas, neither Anne nor Donald Meyer disputed or complained at the first meeting concerning Rubin’s corporate pay or to payment of the executor and attorney’s fees. Insofar as the time of liquidation, Schone-kas testified that it was agreed by the parties in interest attending these meetings that the accountant’s advice would be followed.
Considering this evidence, together with the exhibits, we conclude that the record supports the trial judge’s determinations. We find no error in his factual conclusions. While complaints are made in this appeal regarding evidentiary error involving the violation of the sequestration rule, failure to allow production of Dr. Rubin’s income tax return, failure to allow into evidence a copy of a U.S. District Court indictment and sentence of Dr. Rubin, and failure to allow the production of bank records of Dr. Rubin to ascertain information on his personal loan, we find no prejudice to the opponent. We fail to understand how the presence or absence of the surviving spouse’s attorney in the courtroom would have added or detracted from his testimony. Furthermore, the attempt by the opponent to offer evidence of Dr. Rubin’s financial and personal matters was irrelevant to the factual and legal issues in this opposition. Having so concluded, we find no prejudice to the opponent in the evidentiary rulings made by the trial judge.
As stated by the judge in his reasons, the legal issue is whether any prohibition exists, statutory or otherwise, to prevent an executor from receiving, apart from his executor’s fee, an additional salary from a succession business where the services required for conducting that business are above and beyond the normal executor’s responsibilities. We have been cited and have found no Louisiana authority prohibiting this additional remuneration.
Although it is true that Dr. Rubin did not obtain court authorization under LSA-C.C.P., Art. 3224 to continue the business of the decedent’s corporation, it is apparent he acted in “the best interest of the succession” and with actual or constructive knowledge of Anne True Meyer and all parties concerned. Under the circumstances, we find no error in the trial court’s refusal to reimburse the estate as sought by the opponent-heir. Likewise, because there is no showing that Dr. Rubin violated his fiduciary duty under LSA-C.C.P. Art. 3191 or misapplied succession or corporate funds, we find no abuse of the trial court’s discretion in denying penalties under LSA-C.C.P. Art. 3222.
*307 Finally, we deny Dr. Rubin’s request for damages raised in his answer to the appeal. No demand, in reconvention or otherwise, was made for this claim in the trial court, and we cannot now consider it. See Bell v. Dewitt, 27 So.2d 433 (La.App. 1st Cir. 1946), rehearing refused, 27 So.2d. 924 (La.App. 1st Cir. 1946).
Accordingly, finding no error, we affirm the judgment of the trial court.
AFFIRMED.

. Mrs. Meyer claims the trial judge erred: when he permitted the attorney for the widow of decedent to testify although he had participated in the trial and was present during the entire proceedings in violation of the sequestration order rendered by the judge; when he quashed the subpoena duces tecum for the production of bank records of personal loans of the executor; when he denied the instanta subpoena for the tax return of the executor; when he denied the right to offer into evidence the certified copy of the U.S. District Court record of the indictment and sentencing of the executor; and, when he refused to permit the opponent-heirs counsel to be made counsel of record for the Hibernia National Bank, the named trustee for the succession.

. Joseph L. Barbe, Jr. an associate with A.A. Harmon and Company, the accounting firm used by the corporation prior to and subsequent to decedent’s death testified that the corporate assets constituted 89.77% of the $1,629,409.55 succession inventory.